## AFFIDAVIT OF RICHARD ATWOOD

I, Richard Atwood, being duly sworn, state the following:

**I.     BACKGROUND OF AFFIANT**

1.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C.§ 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. §2516.  I am also a law enforcement officer of the United States defined within the meaning of the 1930 Tariff Act, 19 U.S.C. §1589(a), and 18 U.S.C. §2510(7).  I am a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), currently assigned to the Office of the Special Agent-in-Charge, Boston (SAC/BOS), Airport/Seaport Group, which is responsible for investigating violations involving contraband being imported and exported into and out of the United States.  I have been employed as a Special Agent with HSI since August 2009.  I have received training by HSI in the investigation of smuggled goods and/or contraband over interstate and international lines.  Prior to becoming a Special Agent with HSI, I was employed as a U.S Postal Inspector, working for the United States Postal Inspection Service ("USPIS") for approximately six years.  I received training by the U. S. Postal Inspection Service in the investigation of contraband, including stolen goods, narcotics, and counterfeit documents being transported through the United States mails.  Prior to becoming a United States Postal Inspector, I was a Police Officer with the Phoenix Police Department for approximately four years, and a Manchester, New Hampshire Police Officer for approximately eight months.  Finally, I have a Bachelor of Arts Degree in History that I received while attending Framingham State College, in Framingham, Massachusetts.

2.  I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests. I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

3.  I am currently participating in a criminal investigation of Michael GORDON (hereinafter, "GORDON"), Andrean JAGGON (hereinafter, "JAGGON"), Dagoberto OLEA (hereinafter, "OLEA"), Daphne JEAN, Veneta ROWE, Steve GORDON, Monique GORDON, and others. These individuals are under investigation for drug trafficking in violation of Title 21, United States Code, Sections 841(a) (1) and 846; use of communication facility during or in relation to drug trafficking in violation of Title 21, United States Code, Section 843(b); money laundering and conspiracy to launder monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957; and structuring in violation of Title 31, United States Code, Section 5324(a)(3) (the "Target Offenses").

## II.  PURPOSE OF THE AFFIDAVIT

4.  This affidavit is being submitted in support of an application for a warrant to

search electronic equipment, specifically, two mobile telephones seized from defendant Dagoberto OLEA (hereinafter "OLEA") at the time of his arrest, more particularly described as:

    a.    an AT&T Model Z222 mobile telephone whose sim card holder bears serial number 327B4178E6DA (hereinafter referred to as "Target Telephone 1"); and

    b.    a black Kyocera US Cellular mobile telephone Model E4277 (hereinafter referred to as "Target Telephone 2");

(collectively referred to as "the Target Devices"), which are currently in the possession of Homeland Security Investigations, 10 Causeway Street, Room 722, Boston, MA 02222. Descriptions of Target Telephone 1 and Target Telephone 2 are attached hereto as Attachments A-1 and A-2, respectively. There is probable cause to believe that the Target Devices, and each of them, contain evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

    5.    For the reasons set forth in this affidavit, I submit that probable cause exists to believe the Target Devices contain evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) conspiracy to possess with intent to distribute and/or to distribute controlled substances, in violation of 21 U.S.C. § 846; and (c) use of a communication facility in the commission of a narcotics trafficking offense, in violation of 21 U.S.C. § 843(b).

    6.    The statements contained in this affidavit are based upon my personal observations and review of records, my participation in this investigation, training and experience, and upon information and reports supplied to me by other law enforcement officers who are involved in this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of search warrants, I have not included

each and every fact known to me and other law enforcement officers involved in this investigation, but only such facts necessary to establish probable cause for the issuance of the search warrants.

7. On October 16, 2014, a federal grand jury in the District of Massachusetts indicted GORDON, OLEA, and JAGGON for conspiracy to distribute and to possess with the intent to distribute marijuana, and Michael GORDON for structuring. On November 6, 2014, GORDON, OLEA, and JAGGON were arrested on the above-listed offenses.

8. As set forth more fully herein, I believe GORDON was responsible for obtaining large amounts of marijuana from OLEA in California and sending it to the Boston area, and for distributing that marijuana in the Boston area; that JAGGON, his girlfriend, assisted him in the operation; and that GORDON, JAGGON, and others engage in various financial transactions to launder the proceeds generated by the sale of that marijuana in Massachusetts and elsewhere. I believe there is probable cause to believe that evidence of and relating to those offenses will be found in the Target Devices.

### III. THE INVESTIGATION

#### A. Background of Investigation

9. In August 2011, GORDON was stopped by Transportation and Security Administration (TSA) officials when he attempted to pass through a security checkpoint at Boston Logan's International Airport with approximately $60,000 in cash in his carry-on bag. Following that incident, I began investigating GORDON.

10. I conducted financial queries on GORDON and discovered numerous Currency Transaction Reports (CTRs) evidencing GORDON depositing money into his Bank of America account, along with the accounts of two other individuals, identified as Dagoberto OLEA and

Rafael Olea (Dagoberto's brother), residents of Northern California. Criminal history checks conducted on the OLEAs revealed that Dagoberto OLEA was arrested in September 2011 for the possession of marijuana for sale. In May 2013, search warrants were conducted at OLEAs property, located at 1833 Road B, Redwood Valley, CA, and a large marijuana cultivation operation was discovered on the property. To date based on all the CTRs, GORDON has transferred approximately $800,000 to the OLEAs. Agents were able to obtain video surveillance photographs from the banks for some of the deposits and observed GORDON carrying large sums of US currency prior to the deposits.

### B. Gordon's Use Of Mail Services To Ship Marijuana From California To The Boston Area

11. During the course of the investigation, agents learned that GORDON flew to California and Nevada frequently between June 2012 and February 2014, where he obtained large quantities of marijuana that he then shipped to the Boston area. GORDON frequently rented vehicles from National Car Rental when on these trips.

12. On September 17, 2012, after one such trip, GORDON returned his rental vehicle to National Rent-A-Car at the Oakland International Airport. With the consent of National Rent-A-Car, the agents searched the returned vehicle and found a receipt from Home Depot in Ukiah, California. The items listed on the receipt consisted of 20 five-gallon buckets, duct tape, and oil, which items are often used to ship and disguise the odor of narcotics, particularly marijuana. The mileage from GORDON's vehicle indicated that he drove close to 1100 miles in two days.

13. During the investigation, when agents learned that GORDON had booked flights to California, they sought and obtained federal global positioning system (GPS) tracking warrants from the Northern District of California for GORDON's rental vehicles with National

Rental Car. These investigative efforts revealed that GORDON generally drove the rental vehicles to 1833 Road B in Redwood Valley, California, OLEA's residence. Aerial surveillance of 1833 Road B by the Mendocino County Sheriff's Office in May 2012 and July 2012 revealed marijuana plants being cultivated on the property.

14. GORDON generally remained at OLEA's residence for one or two days, and then drove back to San Francisco the morning of his return flights to Boston. While in San Francisco, GORDON was observed by surveillance agents driving around to different U.S. Post Offices and FedEx mail facilities. Interviews with employees of these facilities after GORDON's visits revealed that he mailed numerous packages at a time from these facilities to addresses in the Boston area. GORDON addressed the packages to non-existent people at real addresses in the Boston area, and similarly utilized real addresses (but false sender names) to identify the sender of the packages. Surveillance agents often saw Andrean JAGGON (hereinafter "JAGGON"), believed to be GORDON's girlfriend, receive and/or pick up the falsely addressed packages upon arrival at delivery addresses in the Boston area.

15. Search warrants were obtained for several of those packages, execution of which revealed that the packages contained marijuana.

16. Examination of shipping records received from Federal Express and USPS revealed that over 300 packages were mailed from San Francisco to addresses related to this investigation between July 2011 and February 2014 – approximately 235 packages were shipped to 5300 Washington Street, apartment 67, West Roxbury, Massachusetts, alone during that time frame. Lynden Jaggon, who receives mail at that address, is Andrean JAGGON's father.

    **C.**    **Search warrants conducted at OLEA's residences**

17. In 2012, HSI San Francisco also began conducting an investigation into OLEA

and his brother, Rafael OLEA, for money laundering and drug distribution. In July 2012, with the assistance of the Mendocino County Sheriff's Office (MCSO), agents conducted aerial surveillance on the properties owned by the OLEA brothers. At two of the addresses, 1833 Road B (OLEA's residence) and 19050 Scenic Drive, both located in Redwood Valley, California, large marijuana grows could be seen. Based on the aerial surveillance information and the information from the GPS tracker data obtained from GORDON's rental vehicles, HSI San Francisco and the MCSO executed state search warrants on the OLEA's properties.

        **1.**     **<u>Search warrant at 1833 Road B, Redwood Valley, California</u>**

18. On May 30, 2013, HSI San Francisco along with the County of Mendocino Marijuana Eradication Task Force (COMMET) served a state search warrant at OLEA's (1833 Road B, Redwood Valley, California). Among the items seized were 233 pounds of processed marijuana and 73 marijuana plants. Among the individuals who were arrested inside the residence was Maria Lourdes ALVAREZ, who was OLEA's girlfriend. Numerous documents were discovered inside OLEA's bedroom that were apparently from or belonged to GORDON, including Massachusetts Vehicle Titles for vehicles allegedly owned by GORDON and his business (Mike's Auto Sales and Repair). Also, discovered were handwritten notes that appeared to be related to the sale of marijuana.

        **2.**     **<u>Search warrant at 19050 Scenic Drive, Redwood Valley, California</u>**

19. On August 20, 2013, the HSI/SF Financial Group and the County of Mendocino Marijuana Eradication Task Force (COMMET) executed a state search warrant at 19050 Scenic Drive in Redwood Valley. This parcel was owned by Dagoberto OLEA as recently as March of 2013. Among the items seized were ninety-two marijuana plants found on the property on three different grows. The plants were eradicated and turned over to COMMET for destruction.

20.     During the service of the search warrant two Hispanic males were encountered on the property.  One of the subjects, Alonso CAMACHO-Diaz, claimed that he resided on the property while he worked the marijuana plants.  The day before, on August 19, 2013, CAMACHO had been seen by HSI SA Ohlander driving a vehicle rented by Michael GORDON in San Francisco, California.  CAMACHO was seen driving the rental vehicle up to a store called "Mailbox 4 U" on Market Street, and carrying large bags into the store with Michael GORDON.  When SA Ohlander encountered CAMACHO at 19050 Scenic Drive on August 20, 2013, CAMACHO was wearing the same shirt he had been wearing the day before with GORDON.

### D.     Arrest of OLEA and Search warrant at 6970 Black Oak Drive, Ukiah, CA

21.     On November 6, 2014, following his indictment in the District of Massachusetts, HSI San Francisco Special Agents and MCSO officers arrested OLEA at 6970 Black Oak Drive in Ukiah, California.  OLEA was searched incident to his arrest, and two cellular phones (the Target Devices), were found on his person and seized.

22.     After OLEA's arrest, agents from HSI San Francisco and MCSO went to 6970 Black Oak Drive, Ukiah, California in order to inform OLEA's wife that he had been arrested.  Upon parking in front of the garage, MCSO Deputies could smell a strong odor of fresh marijuana.  Another MCSO Deputy observed marijuana debris in plain view inside of a small outbuilding next to the garage.

23.     MCSO Deputies approached the front door and contacted OLEA's wife, Maria ALVAREZ, who was previously contacted in May 2013 during the execution of the state search warrant at 1833 Road B, Redwood Valley, California.  Deputies advised ALVAREZ that OLEA had been arrested and confirmed that OLEA now resided at the Black Oak Drive residence.  Deputies asked ALVAREZ if there was marijuana inside the residence, and she stated that she

did not know.  MCSO asked ALVAREZ for consent to search the residence; however, ALVAREZ denied consent.  At that point MCSO secured the residence and applied for and received a state search warrant for the premises.  Among the items seized were approximately 170 pounds of processed marijuana, three digital scales, a vacuum sealer, and miscellaneous documents including a Massachusetts Department of Transportation Certificate of Title bearing the name of Michael GORDON.

      E.      **Arrest of GORDON and Search of His Residence**

24.      On November 6, 2014, HSI Boston Special Agents arrested GORDON pursuant to a federal arrest warrant, and executed a federal search warrant at GORDON's residence.  As a result of the search, agents discovered what appeared to be a new shipment of fresh marijuana contained inside of an orange Home Depot bucket, which was similar to the packaging of marijuana shipments sent by GORDON and previously seized by law enforcement.

**IV.      THE PROPOSED SEARCHES OF THE TARGET DEVICES**

25.      Based on my training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other

information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that the Target Devices have at least some of the capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.

26. Based upon my training and experience, and the training and experience of other investigators with whom I have worked and spoken, I know that:

   a. It is common for narcotics traffickers to maintain paper and electronic books, records, receipts, notes, ledgers, notes, emails, airline tickets, and receipts relating to the transportation, ordering, sale and distribution of controlled substances, the purchase of financial instruments, and/or the transfer of funds. These records and items are maintained where the traffickers have ready access to them, including computers, cell phones, and other electronic media and devices capable of storing such information electronically;

   b. It is common for drug dealers to maintain records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

   c. Narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

   d. Even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

   e. It is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks,

money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses, or other locations over which they maintain dominion and control;

f. Narcotics traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described above. I have also encountered beepers, cell phones, smart phones, and other electronic media being used in this manner, all of which facilitate drug distribution;

g. Traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s); and

h. Traffickers keep photographs of themselves, their associates, and their property and usually maintain these photographs in their possession, more and more frequently on their cell phone(s) and other electronic devices.

27. Based upon my knowledge, training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, that they typically carry and use multiple cellular telephones at any one time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an attempt to avoid detection, and that drug traffickers frequently change cell phones and cell phone numbers for this reason. I also know that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

A. **Investigators' Possession of the Equipment**

28. The Target Devices are currently in the possession of the Homeland Security

Investigations, and are being stored at its facilities, as described in Attachment A. Investigators obtained the equipment from HSI San Francisco after the Target Devices were seized incident to OLEA's arrest.

29.    From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that they have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the investigators' possession.

30.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Although neither Target Device is an iPhone, Samsung Galaxy, or other common smartphone, both Target Device models have digital cameras, both are capable of sending and receiving text messages, and both have the capability to store electronic data.

31.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

      a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

  b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

  d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

  32. Searching the Target Devices for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, various data analysis techniques may be necessary to

locate and retrieve the evidence described in Attachment B.

33. Based on my training and experience and the evidence recovered during this investigation and following OLEA's arrest, I believe that documents, records, videos, photographs, and other evidence of drug trafficking and money-laundering activities will be found on the Target Devices.

## V. CONCLUSION

34. Based upon the facts set forth above, there is also probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the equipment described in Attachments A-1 and A-2.

_____
Richard F. Atwood
Special Agent
Homeland Security Investigations

Subscribed and Sworn to before me

On this /7 day of June, 2015

_____
HONORABLE DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts



## ATTACHMENT A-1

**(Description of Property to be Searched)**

An AT&T Model Z222 mobile telephone whose sim card holder bears serial number 327B4178E6DA, currently in the custody of Homeland Security Investigations, 10 Causeway Street, Room 722, Boston, MA 02222

**ATTACHMENT A-2**

**(Description of Property to be Searched)**

A black Kyocera US Cellular mobile telephone Model E4277, currently in the custody of Homeland Security Investigations, 10 Causeway Street, Room 722, Boston, MA 02222

## ATTACHMENT B

### (Items to be Seized)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances); 21 U.S.C. § 841(a)(1) (manufacture, distribution, and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of communication facility to facilitate drug trafficking); 18 U.S.C. §§ 1956 and 1957 (laundering of monetary instruments and conspiracy to launder monetary instruments); and 31 U.S.C. § 5324(a)(3) (structuring); from January 1, 2011 through November 2014, including:

a. Any identifying information for the telephones listed in Attachments A-1 and A-2 (the Target Devices), including any telephone numbers for the Target Devices;

b. Names and contact information that have been programmed into the Target Devices (including but not limited to contacts lists) of individuals who may be engaged in narcotics trafficking or money laundering;

c. Logs of calls (including last numbers dialed, last calls received, time of calls, and duration of calls) both to and from the Target Devices;

d. Text messages both sent to and received from the Target Devices (including any in draft form) relating to or referencing narcotics trafficking or money laundering and/or referencing individuals engaged in narcotics trafficking or money laundering;

e. Incoming and outgoing voice mail messages both to and from the Target Devices relating to or referencing narcotics trafficking or money laundering or individuals engaged in narcotics trafficking or money laundering;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Target Devices (including any in draft form) relating to or referencing narcotics trafficking or money laundering or individuals engaged in narcotics trafficking or money laundering;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing narcotics

      trafficking or money laundering or individuals engaged in narcotics trafficking or money laundering;

h.     All data within the Target Devices evidencing ownership, possession, custody, control, or use of the Target Devices; and

i.     Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**DEFINITIONS**

For the purpose of this warrant:

A. "Equipment" means any hardware, software, storage media, and data.

B. "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**Return of Seized Equipment**

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits, or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.